16

Louis Grumet, Individually and as Executive Director of the New York State School Boards Association Inc., et al., Respondents, v Board of Education of the Kiryas Joel Village School District et al., Appellants.

Third Department, December 31, 1992

## APPEARANCES OF COUNSEL

*Miller, Cassidy, Larroca & Lewin,* Washington, D.C. *(Lisa D. Burget* of counsel, and *George Shebitz, P. C.,* Washington, D.C., of counsel), for Board of Education of the Kiryas Joel Village School District, appellant.

*Ingerman, Smith, Greenberg, Gross, Richmond, Heidelberger, Reich & Scricca,* Northport *(Lawrence W. Reich* of counsel), for Board of Education of the Monroe-Woodbury Central School District, appellant.

*Jay Worona,* Albany *(Pilar Sokol* of counsel), for New York State School Boards Association, respondent.

*Robert Abrams, Attorney-General,* Albany *(Julie S. Mereson* and *Peter H. Schiff* of counsel), in his statutory capacity under Executive Law § 71.

*Bernard F. Ashe,* Albany *(Gerard John De Wolf* of counsel), for New York State United Teachers, *amicus curiae.*

*Marc D. Stern* and *Lois C. Waldman,* New York City, for American Jewish Congress, *amicus curiae.*

*Stanley Geller,* New York City *(Lisa Thurau* of counsel), for Committee for Public Education and Religious Liberty, *amicus curiae.*

### OPINION OF THE COURT

CASEY, J.

The Laws of 1989 (ch 748) (hereinafter chapter 748) created a new school district, the Kiryas Joel Village School District (hereinafter the Village District), consisting of the territory of the Village of Kiryas Joel (hereinafter the Village), a community of Satmarer Hasidim located wholly within the boundaries of the Monroe-Woodbury Central School District (hereinafter the Monroe-Woodbury District) in Orange County. The statute reflects a political solution to a lengthy dispute between the Monroe-Woodbury District and the residents of the Village, most of whose children attend private religiously affiliated schools within the Village, concerning the provision of special educational services to the Village's handicapped children.

Despite earlier efforts at accommodating the undisputed needs of the Village's handicapped children, resolution of the dispute, which centered on where the services had to be offered, was sought by way of litigation. The Court of Appeals ultimately held that the Monroe-Woodbury District "is neither compelled to make services available to private school handicapped children only in regular public school classes and programs, nor without authority to provide otherwise" *(Board of Educ. v Wieder,* 72 NY2d 174, 187). The Court also rejected the villagers' claim that the services had to be provided within their private schools or at a neutral site *(supra,* at 187-189). Unfortunately, the dispute was not resolved, for the Monroe-Woodbury District continued to offer the services at its public schools and the villagers refused to permit their children to attend the public schools. The creation of the Village District, which could establish its own public school to provide the

services within the Village, was viewed as "a good faith effort to solve this unique problem" (Governor's Mem approving L 1989, ch 748, 1989 McKinney's Session Laws of NY, at 2430).

Plaintiffs, the New York State School Boards Association (hereinafter the Association) and two officers of the Association, commenced this action against several State officials, including the Commissioner of Education and the Comptroller, seeking a judgment declaring chapter 748 unconstitutional. The two school districts moved to intervene as defendants and their motions were granted. Thereafter, the parties stipulated to the discontinuance of the action as to the State officials, although the Attorney-General continued to defend the constitutionality of the statute pursuant to Executive Law § 71. The parties cross-moved for summary judgment and Supreme Court declared the statute unconstitutional, resulting in this appeal.

■ The preliminary issue to be addressed is the question of standing. Defendants maintain that the Association and its officers, in their capacity as representatives of the Association, do not have standing to maintain this action. We agree. There is nothing in the record to establish that the Association itself is a citizen taxpayer within the meaning of State Finance Law article 7-A and there is no claim that the Association has sustained any injury in fact. Accordingly, the Association does not have standing in its own right to maintain this action (see, *Matter of Otsego 2000 v Planning Bd.,* 171 AD2d 258, 260, *lv denied* 79 NY2d 753). Nor has it been shown that the Association meets the three requirements for associational or organizational standing (*Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761, 775). As units of municipal government, the Association's member school boards do not have the substantive right to raise constitutional challenges to a State statute, particularly in the absence of any claim that compliance with the statute will force one or more of the member school boards to violate a constitutional proscription (see, *Matter of Jeter v Ellenville Cent. School Dist.,* 41 NY2d 283, 287). The only two school districts that might arguably have standing, the Monroe-Woodbury District and the Village District, are parties to this action and the Association clearly does not represent their interests. We conclude, therefore, that the Association and the officers of the Association lack standing to maintain this action. We note that plaintiffs' reliance on *New York State School Bds. Assn. v Sobol* (168 AD2d 188, *affd* 79 NY2d 333) is misplaced, for the issue of the

Association's standing to maintain that action was neither raised nor decided.

The two individual plaintiffs, Louis Grumet and Albert W. Hawk, are named as party plaintiffs individually, as well as in their capacity as officers of the Association. In their individual capacity, each clearly meets the definition of citizen taxpayer contained in State Finance Law § 123-a and, therefore, they have statutory standing to maintain an action for declaratory or injunctive relief to prevent the unconstitutional disbursement of State funds (State Finance Law § 123-b [1]). It is undisputed that the Village District created by chapter 748 will receive State funding and, therefore, the constitutionality of that statute can be challenged in a citizen taxpayer action *(see, Matter of Cario v Sobol,* 157 AD2d 172, 175). The fact that the action was discontinued as to the State officials when the two school districts intervened as party defendants does not alter this conclusion, for the expenditure of State funds remains an issue and the Attorney-General continues to appear in the action pursuant to Executive Law § 71.

■ Turning to the merits, we agree with Supreme Court that chapter 748 violates the Establishment Clause of the US Constitution and NY Constitution, article XI, § 3. The tripartite analysis under the Establishment Clause introduced in *Lemon v Kurtzman* (403 US 602, 612), which the United States Supreme Court declined to reconsider in *Lee v Weisman* (505 US —, —, 112 S Ct 2649, 2655), requires: "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion * * * [and third], the statute must not foster 'an excessive government entanglement with religion' " *(Lemon v Kurtzman, supra,* at 612-613, quoting *Walz v Tax Commn.,* 397 US 664, 668).

According to defendants, the statute has the secular purpose of providing special educational services to handicapped children who are not receiving those services. This argument ignores two undisputed facts: the handicapped children of the Village were already entitled to receive those services pursuant to existing Federal and State law *(see,* 20 USC § 1400 *et seq.;* Education Law § 4401 *et seq.),* and those services were actually available to the Village children from the Monroe-Woodbury District, within which the Village was located. The only reason that the children did not receive the services is their parents' refusal to let them attend the public schools of

the Monroe-Woodbury District where the services were available. The stated reason for this refusal is the fear and trauma allegedly sustained by the children upon leaving the language, lifestyle and environment of the Village and mixing with others *(Board of Educ. v Wieder,* 72 NY2d 174, 188, *supra).* The challenged statute, therefore, was designed not merely to provide special educational services to the handicapped children of the Village, but to provide those services within the Village so that the children would remain subject to the language, lifestyle and environment created by the community of Satmarer Hasidim ·and avoid mixing with children whose language, lifestyle and environment are not the product of that religion. The dissent finds a secular purpose for the statute in that it would provide the handicapped children of the Village with the publicly supported, secular special educational services they need and to which they are entitled, but as previously noted those services were already available to all of the handicapped children of the Monroe-Woodbury District, including the handicapped children of the Village. Thus, the only secular need for the statute recognized by the dissent did not, in fact, exist.

Assuming that the statute can be viewed as having a secular purpose, the second guideline of the *Lemon* test requires that the principal or primary effect must not advance religion. The Court of Appeals recently explained: "A particular concern under the 'effects' prong is 'whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices' * * * Context determines whether particular governmental action is likely to be perceived as an endorsement of religion * * * Governmental action 'endorses' religion if it favors, prefers, or promotes it" *(New York State School Bds. Assn. v Sobol,* 79 NY2d 333, 339-340, quoting *Grand Rapids School Dist. v Ball,* 473 US 373, 390).

Defendants claim that the creation of a school district to provide educational services should be treated no differently than the creation of a village to provide municipal services, such as police and fire protection. The Supreme Court, however, has recognized that the relationship between government and religion in the education of children is a sensitive one and that government's activities in this area can have a magnified impact, creating "an all-too-ready opportunity for

divisive rifts along religious lines in the body politic" *(Grand Rapids School Dist. v Ball, supra,* at 383).

Defendants also contend that the provision of educational services to sectarian students and the segregation of those students from others who are not of that sect are incidental benefits which do not offend the Constitution *(see, Mueller v Allen,* 463 US 388, 393; *Wolman v Walter,* 433 US 229, 247-248). Considering the entire context in which the statute was enacted, we conclude that the statute not only authorizes a religious community to dictate where secular public educational services shall be provided to children of the community, it creates the type of symbolic impact that is impermissible under the second prong of the *Lemon* test.

As previously noted, the educational services which the statute was intended to provide were already available to the Village children at public schools within the school district where they resided but outside the boundaries of the Village. If those services were inadequate or inappropriate, as defendants now suggest, existing remedies were available for the parents to pursue *(see,* Education Law § 4404). Instead, the parents claimed that the service had to be provided within the private schools in the Village or at a neutral site within the Village. When this claim proved unsuccessful *(see, Board of Educ. v Wieder, supra),* the parents continued to refuse the services available at the public schools of the Monroe-Woodbury District.

Chapter 748 created a school district coterminous with the Village, which is inhabited by residents who are almost exclusively of one religious sect. The school board is controlled by members of that sect and the children who attend the public school established by the district are all of that sect. The services provided by the school were already available to the children of the Village, but their parents refused to permit them to mix with other students whose language, lifestyle and environment were not the product of the same religious sect. As a result of the statute, the services which were otherwise available at the public schools of the Monroe-Woodbury District are now provided by a public school that is controlled by and located within the religious community, and the children of the community who attend that school are effectively segregated from children of other religions. Regardless of whether the public school operated by the Village District is a neutral site, and regardless of how scrupulous the district is in maintaining the secular nature of the educational services

offered at the school, we are of the view that the symbolic union between church and State effected by the creation of a school district coterminous with a religious enclave to provide within that enclave educational services that were already available elsewhere is significantly likely to be perceived by adherents of the Satmarer Hasidim as an endorsement, and by nonadherents as a disapproval, of their individual religious beliefs *(see, Grand Rapids School Dist. v Ball, supra,* at 389-392).

We emphasize that it is not the location of the public school in the religious community and the provision of public educational services to sectarian students that we find offensive to the Establishment Clause *(see, Board of Educ. v Wieder, supra,* at 189, n 3). The impermissible effect is the symbolic impact of creating a new school district coterminous with a religious community to provide educational services that were already available in an effort to resolve a dispute between the religious community and the school district within which the community was formerly located, a dispute based upon the language, lifestyle and environment of the community's children created by the religious tenets, practices and beliefs of the community.

The dissent asserts that we are foreclosed from considering whether the religious tenets, practices and beliefs of the community played a role in the Village's refusal to accept the special educational services offered by the Monroe-Woodbury District. The record, however, contains uncontradicted evidence of a direct link between the language, lifestyle and environment of the community's children and the religious tenets, practices and beliefs of the community. Based upon similar evidence and in a similar procedural posture, the Court of Appeals had little difficulty finding such a connection. "With an apparent over-all goal that *children should continue to live by the religious standards of their parents,* 'Satmarer want their school to serve primarily as a bastion against undesirable acculturation, as a training ground for Torah knowledge in the case of boys, and, in the case of girls, as a place to gather knowledge they will need as adult women' " *(Board of Educ. v Wieder, supra,* at 180 [emphasis supplied]). The stated reason for the Satmarer parents' refusal of the services offered by the Monroe-Woodbury District was the emotional toll on the Satmarer children allegedly sustained upon "leaving their own community and being with people whose ways were so different from theirs" *(supra,* at 181).

Because the "ways" of the Satmarer children were molded by the religious standards of their parents (*supra,* at 180), there can be little doubt that, in fact, religion played a role in the dispute, which we have considered as one of several factors in our decision. Contrary to the dissent's interpretation, our holding, which concerns only the validity of the statute that created a new school district coterminous with a religious community to provide secular services that were already available to the community, has no bearing on whether the Satmarer are somehow "disqualified" from receiving those services. It is noteworthy that although the dissent asserts that we must ignore these undisputed facts, the dissent's "fair and comprehensive analysis by an objective observer" encompasses a search both within and without the record to support the theory that the statute's creation of a school district coterminous with a religious community to provide services to that community which were already available is not relevant in determining whether the particular governmental action is likely to be perceived as an endorsement of religion.

Finding that the Satmarer's handicapped children have "special psychological vulnerabilities * * * to exposure to the outside world", the dissent is apparently of the view that the special educational services offered by the Monroe-Woodbury District were not "protective" of these "special psychological vulnerabilities". Pursuant to Federal and State law, handicapped children are entitled to an appropriate special education program and placement, and a parent who finds the placement unacceptable can seek review (*Matter of Northeast Cent. School Dist. v Sobol,* 79 NY2d 598, 603). If, as the dissent assumes, the services offered by the Monroe-Woodbury District were inappropriate as not "protective" of the Satmarer children's "special psychological vulnerabilities", the parents had an available administrative remedy to review the proposed placements pursuant to Education Law § 4404 and, if necessary, judicial review of the determination produced by the administrative appeal. This review process could have addressed all of the parents' secular concerns. The dissent's suggestion that the creation of a new school district was the appropriate remedy to address the Satmarer parents' claim that the services offered by the Monroe-Woodbury District were inappropriate for the special needs of their children is less than compelling.

The dissent's alternative argument, that the creation of a new school district might constitute "a valid alleviation of a

burden on the Satmarer's religious precepts", is premised on "the majority's assumption that segregated education of their young is an integral part of Satmar religious precepts". We have made no such "assumption". We have merely recognized that uncontradicted evidence in this record and in the prior litigation establishes a direct link between the Satmarer parents' refusal to accept the services of the Monroe-Woodbury District and the religious tenets, practices and beliefs of the community which have molded the language, lifestyle and environment of the community's children, resulting in an alleged emotional toll when the children leave the community and are with people whose ways are so different from theirs. The Satmarer themselves do not claim that they refused the services of the Monroe-Woodbury District because segregated education of their young is an integral part of Satmarer precepts and we have not made such an assumption. By going beyond the stated position of the Satmarer, the dissent has disregarded its own limitation on the scope of review of the facial validity of chapter 748.

Having concluded that even if chapter 748 has a secular purpose its principal or primary effect advances religion, we see no need to consider the third prong of the *Lemon* test. Although we have concluded that the Association and its officers lacked standing to maintain this action, we see no need to modify Supreme Court's declaratory judgment, which did not grant any specific relief to the Association or its officers. The individual plaintiffs have standing to maintain this action as citizen taxpayers and Supreme Court granted the appropriate declaratory relief. Its judgment should, therefore, be affirmed.

LEVINE, J. P. (dissenting). In my view, it was error for Supreme Court to have granted summary judgment declaring the legislation under review here (L 1989, ch 748) (hereinafter chapter 748) creating the Kiryas Joel Village School District (hereinafter the Village District), encompassing the territory of the Village of Kiryas Joel (hereinafter the Village) itself, to be facially invalid as a violation of the Establishment Clause of the 1st Amendment to the US Constitution or of article XI, § 3 of the NY Constitution.

I find the distinction, for Establishment Clause purposes, between a law's facial invalidity and invalidity as applied to be far from clear in the case law *(see, Bowen v Kendrick,* 487 US 589, 601-602, *supra,* at 627-628 [Blackman, J., dissenting]).

What is clear, however, is that, in deciding that this case was ripe for a determination of the statute's facial invalidity on a motion for summary judgment, Supreme Court and the majority of this Court have relied upon extrinsic evidence sharply disputed by the Village District and have ignored evidence submitted by the Village District showing its religiously neutral implementation of the statute, a factor I believe is relevant on the statute's validity both facially and as applied. Moreover, I think the statute is sustainable on a facial challenge even under the majority's factual assumptions, as a limited, permissible accommodation to the values represented by the Free Exercise Clause of the 1st Amendment on behalf of the Satmarer Hasidim inhabiting the Village. I would, therefore, reverse, declare the statute facially valid and remit for trial of the disputed factual issues to determine whether the statute is valid as applied. Clearly, plaintiffs have raised a challenge to the validity of the statute as applied in the second amended complaint and the submissions on their motion for summary judgment. Thus, I would give the Satmarer Hasidim their day in court to establish that the statute can be and has been implemented in a way that sufficiently separates the Village District's provision of special educational services for their handicapped children from their religious precepts and practices to avoid conflict with the Establishment Clause.

The invalidity of a statute under the Establishment Clause, facially or as applied, is to be determined by whether it contravenes one or more of the three elements of the test announced in *Lemon v Kurtzman* (403 US 602, 612) and recently left standing by the United States Supreme Court in *Lee v Weisman* (505 US —, —, 112 S Ct 2649, 2655). Under *Lemon,* to avoid violating the Establishment Clause a statute must have a secular legislative purpose, its principal or primary effect must be one that neither advances nor inhibits religion, and it must not foster excessive governmental entanglement with religion.

Regarding the "purpose" prong of the *Lemon* test, the legislative history of chapter 748 recites that it was enacted to break the impasse between the members of the Satmar Hasidic sect, who comprise the vast majority of the inhabitants of the Village, and the Monroe-Woodbury Central School District (hereinafter the Monroe-Woodbury District), whose territory contained the Village, over the public provision of special educational services for the handicapped children of the Village. As is more fully described in the Court of Appeals'

decision in the previous litigation involving this dispute *(see, Board of Educ. v Wieder,* 72 NY2d 174), the Monroe-Woodbury District had taken the position that special educational services would only be offered at fully integrated public schools located outside the Village, whereas the Satmarer parents insisted that their handicapped children should be provided these services in the Village, either at the parochial schools where all of the nonhandicapped Satmarer children are educated, or at a neutral site. When the prior litigation failed to resolve the dispute *(see, supra),* chapter 748 was enacted for the stated purpose of ensuring that the handicapped children of the Satmarer Hasidim would receive the publicly supported, *secular* special educational services they need and to which they are entitled, at a neutral site in the Village *(see,* Governor's Mem approving L 1989, ch 748, 1989 Legis Ann, at 324-325).

The foregoing secular purpose is sufficient to comply with the purpose facet of the *Lemon* test, which is only breached if the enactment was "motivated *wholly* by [a religious] purpose" *(Bowen v Kendrick,* 487 US 589, 602, *supra* [emphasis supplied]; *see, Wallace v Jaffree,* 472 US 38, 56). Thus, the apprehension expressed in the majority's decision as to some additional, or perhaps ulterior, religion-based motive underlying the enactment of chapter 748 would not serve to render it invalid in this respect. Moreover, in determining the legislative purpose for Establishment Clause analysis, "a court has no license to psychoanalyze the legislators * * * If a legislature expresses a plausible secular purpose * * * then courts should generally defer to that stated intent" *(Wallace v Jaffree, supra,* at 74-75 [O'Connor, J., concurring]).

The ultimate ground for the majority's invalidation of chapter 748, however, is its conclusion that the primary or principal effect of the legislation is to advance religion. I disagree. It bears emphasis that we are reviewing a determination that chapter 748 is facially invalid, made by Supreme Court in granting plaintiffs' motion for summary judgment. In deciding upon the facial validity of the statute, particularly on cross motions for summary judgment, I believe that this Court should not be looking for ulterior motives for the enactment. Rather, we are bound to look at chapter 748 as a response to the *stated* position of the Satmar sect, expressed not only in sworn affidavits here but consistently throughout the dispute over special educational services for its handicapped children *(see, Board of Educ. v Wieder,* 72 NY2d 174, 180, n 2, 189,

*supra).* As repeatedly stated, the motive for the Satmarer parents' refusal to accept the special educational services for their handicapped children offered by the Monroe-Woodbury District was not religious, but was to protect the children from the psychological and emotional trauma caused by exposure to integrated classes outside the Village that were inadequately addressed by the professional staff of the Monroe-Woodbury District.

Thus, on summary judgment the majority seems erroneously to be relying upon a description of Satmar religious precepts on educating the sect's nonhandicapped children contained in the affidavit of Israel Rubin, Ph.D., submitted by plaintiffs, as establishing a religion-based motivation for the refusal of the Satmarer Hasidim to accept the special educational services offered by the Monroe-Woodbury District. Such a sectarian basis for their refusal, however, appears to be directly contradicted by the affidavit of the School Board President of the Village District submitted in the instant case as to the reason why the Monroe-Woodbury District's offer of such services was refused. That affidavit states: "Monroe-Woodbury has refused to accommodate the distinct language and cultural needs of the handicapped children in [the Village] by providing their education at a neutral site in their locality * * * Because Monroe-Woodbury's restrictions on the educational services for the handicapped children from [the Village] would have a major adverse effect on their educational progress, the handicapped children in [the Village] were not able to receive the special educational services they needed from the public educational system." The foregoing secular basis for the refusal to accept the services provided by the Monroe-Woodbury District was the same position asserted by the Satmarer Hasidim in the *Board of Educ. v Wieder (supra)* litigation. Indeed, the reason why the Court of Appeals in that case refused to entertain a belated claim that providing such special educational services at a neutral site in the Village was mandated under the Free Exercise Clause was that the Satmarer "in their submissions to the trial court insisted that, as a class, they should be exempted from public school placements only for *nonreligious* reasons—most particularly because of the emotional impact on the children of traveling out of Kiryas Joel" *(supra,* at 189 [emphasis in original]). And, in the same decision, after quoting from a treatise describing Satmar religious precepts on the education of children authored by the person whose affidavit the major-

ity relies upon here, the Court of Appeals added in a footnote that the members of the Satmar sect in that case never conceded the accuracy of that description. "Indeed, in their submissions, they make no reference to their religious beliefs or practices, only their life-style and environment" (*supra,* at 180, n 2).

While I am not able to discern with complete confidence why the majority rejects the foregoing religious-neutral explanation by the Satmarer for their refusal to accept the special educational services of the Monroe-Woodbury District, the majority's rationale seems to be based on either one of two propositions. The first of these is that the Satmarer's explanation is disingenuous, i.e., that segregated education of even its handicapped children is in fact at the core of the Satmar sect's religious beliefs. That proposition, however, is clearly contested by the Village District and, thus, cannot properly form the basis for granting plaintiffs' motion for summary judgment. Beyond that procedural barrier to adopting this proposition, it has grave constitutional implications because it entangles a State civil court in factfinding on what is true Satmar religious doctrine on educating handicapped children (*see,* Tribe, American Constitutional Law § 14-11, at 1231 [2d ed]).

Alternatively, the majority's decision may be read as concluding that the Satmarer's professed secular explanation for rejecting the Monroe-Woodbury District's offer of services is, nonetheless, religion based, because the Satmarer's cloistered lifestyle and cultural outlook are derived from their religious beliefs. This, too, has grave constitutional implications under both religion clauses of the 1st Amendment. In effect, the majority is saying that the State may not respond to a bona fide *secular interest* of the Satmarer Hasidim, i.e., the psychological and emotional vulnerabilities of their handicapped children, because the culture bringing about the insecurities of these youngsters was "molded" by Satmar religious precepts. In a real sense, then, the majority is thus holding that merely because of some link between their religion and a legitimate secular need, the Satmarer are disqualified from receiving from the State the purely secular services to meet that secular need. The case law simply does not support such a rigidly impenetrable wall between church and State as is implicit in this aspect of the majority's decision. Indeed, such a holding conflicts with the United States Supreme Court's decisions that a State does not violate the Establishment

Clause by commemorating the secular, *cultural* aspects of the Christmas/Chanukah holiday season, despite its religious origins *(see, Allegheny County v Greater Pittsburgh ACLU,* 492 US 573, 617-620; *Lynch v Donnelly,* 465 US 668). Thus, in my view, the alleged motivations of the Satmarer Hasidim for refusing fully integrated special educational services outside the Village cannot be the basis for a determination of a facial invalidity of the statute on a summary judgment motion.

Furthermore, in resolving doubts regarding the facial validity of a statute, a court may properly look to how it has been interpreted and applied by the governmental agency charged with enforcing it *(see, Ehlert v United States,* 402 US 99, 105-107; *see also, Grayned v City of Rockford,* 408 US 104, 110-111). Therefore, for summary judgment purposes, the sworn submissions of the Village District on the manner in which chapter 748 has been implemented should also be accepted as true. Summarized, the Village District's proof is that the provision of special educational services under chapter 748 takes place at a site distinctly and physically separate from the Village parochial schools and, indeed, from any other place of religious observance. Additionally, the services being provided are distinctly secular as to content, professional staff and physical surroundings.

In the absence of a religious purpose for creation of the Village District as a substitute for the Monroe-Woodbury District, the provision of purely secular special educational services to the Satmarer handicapped children in an atmosphere that is *not* only *not* "pervasively sectarian", but actually totally devoid of religious influences, appears to be virtually indistinguishable from the provision of therapeutic and remedial services to isolated groups of parochial school students upheld by seven Justices of the United States Supreme Court in *Wolman v Walter* (433 US 229, 244-248). In *Wolman,* the Supreme Court specifically rejected the notion that the provision of secular therapeutic and remedial services to school children at a neutral site is suspect, as having the effect of advancing religion, merely because the recipients of the services were separate groups composed exclusively of parochial school students *(supra)*.

If not virtually the same as in *Wolman v Walter (supra)*, the fact pattern which we are bound to accept in the present procedural posture of the case is far closer to *Wolman* than it is to *Parents' Assn. of P.S. 16 v Quinones* (803 F2d 1235), the case most heavily relied upon by Supreme Court in granting

summary judgment in this case. In *Parents' Assn. of P.S. 16,* the challenged program of remedial instruction for the Satmarer parochial school children at the premises of a New York City public school not only ethnically segregated the children, it virtually replicated the educational practices of the Satmar parochial school by gender segregation for teachers and students, the use of Yiddish as the primary language of instruction and adoption of a reading instruction method employed only in the parochial school *(supra,* at 1237). Additionally, in *Parents' Assn. of P.S. 16,* the Court accepted factual assertions regarding Satmar religious precepts on education and relied on factual concessions of public educational authorities that are in dispute here and, thus, should be disregarded on summary judgment in the litigation at hand.

Despite the similarity between the instant case and *Wolman v Walter (supra),* as premised on the only facts which this Court should properly consider, the majority holds nonetheless that the statutory creation of the Village District has the primary effect of advancing religion because it will be *perceived* as a symbolic State endorsement of Satmar Hasidism. As I read the majority decision, this conclusion is based upon three factors: (1) the creation of a school district coterminous with a "religious enclave", (2) the preexisting availability of special educational services for Satmarer handicapped children provided by the Monroe-Woodbury District outside the Village, and (3) that the true basis for the Satmarer's refusal to accept the integrated special educational services for their handicapped children outside the Village was the conflict which fully integrated schooling would present to their fundamental religious beliefs, or with cultural values inseparable from their religious beliefs.

As to the majority's supposition that the Satmarer's refusal to accept the special education services offered by the Monroe-Woodbury District was religion based, I shall not repeat the reasons for my strong conviction that, on a facial challenge, and particularly on a motion for summary judgment in that context, we are not permitted to go behind the publicly stated and sworn to position of the Satmarer Hasidim of a nonreligious motivation for the refusal.

At first blush, the two other factors relied upon by the majority might well be instinctively perceived as establishing that the State too readily acceded to the Satmarer's "dictates" and, in some sense, thereby symbolically endorsed the sect's religious tenets. However, the question of whether a statute's

primary effect is to aid religion by reason of being perceived as a State endorsement of some religious denomination, or of religion in general, is not to be answered by an uncritical reaction to some superficial or selective presentation of the facts or circumstances concerning the legislation in question. Justice O'Connor, the original proponent of the perception of endorsement approach to adjudging the principal effects of religion-related legislation *(see, Lynch v Donnelly,* 465 US 668, 691-692, *supra* [O'Connor, J., concurring]), has stated that "[t]he relevant issue is whether *an objective observer,* acquainted with the text, *legislative history,* and *implementation* of the statute, would perceive [the statute] as a state endorsement" *(Wallace v Jaffree,* 472 US 38, 76, *supra* [O'Connor, J., concurring] [emphasis supplied]).

A fair and comprehensive analysis by an objective observer would have to take into account (1) the professed lack of religious motive of the Satmarer Hasidim for the creation of the Village District previously described, (2) that, uncontrovertably, the Satmarer would have been content had the Monroe-Woodbury District provided educational services at a neutral site in the Village, thus obviating many of the features of the creation of the Village District relied upon by plaintiffs to show symbolic endorsement of religion, (3) that, although the elected Board of Education of the Village District is likely to be entirely composed of Satmarer Hasidim, the Board lacks autonomy in appointing a Superintendent of Schools *(see,* Education Law § 1711 [3]) and the Superintendent is the official controlling the administration of the program *(see,* Education Law § 1711 [5]),* and (4) that the implementation of chapter 748 has resulted in the appointment of a highly qualified professional, *not* a member of the Satmar sect, as Superintendent of Schools, who is administering the program with autonomy to provide purely secular special educational services in an atmosphere completely divorced from and in significant respects inconsistent with the precepts of the Satmar sect.

I think that the foregoing facts and circumstances would attenuate, in the eyes of an objective observer, the significance of the creation of a school district coterminous with the

---

* Moreover, the Board of Education's ability to interject religion into the services provided to the children appears to be weak and improbable in light of the dominant supervisory and programmatic regulatory role of the State Department of Education over special educational services for handicapped children *(see,* Education Law § 4403; 8 NYCRR part 200).

Village territory and the availability of special educational services outside the Village as indicia of a State endorsement of Satmar religious precepts. Both factors were merely collateral to the Satmarer's stated objective of obtaining purely secular special educational services for the sect's handicapped children and *their* willingness to accept those services in a truly nonsectarian atmosphere, so long as it was protective of the special psychological vulnerabilities of those children to exposure to the outside world. These are, in my opinion, the only inferences that can fairly be drawn from the evidence contained in the Village District's submissions, and they are insufficient to demonstrate a symbolic link between church and State, as a matter of law *(see, Bowen v Kendrick,* 487 US 589, 613, *supra).*

Even if I were to agree with the majority, however, that the Satmar sect's refusal to accept the Monroe-Woodbury District's integrated special educational services for its handicapped children was based upon fundamental religious beliefs or upon cultural values inseparable from its religious beliefs, I would nonetheless hold that the accommodation of the State to those values and beliefs by the enactment of chapter 748 did not have the primary effect of advancing religion. Rather, the statute survives a facial challenge because its principal effect would then be to lift a substantial burden on the sect's free exercise of religion. The legitimacy of the right of an insular religious sect, under the Free Exercise Clause of the 1st Amendment, to prevent exposure of their children to the worldly influences and inconsistent secular values of the public school system was recognized in *Wisconsin v Yoder* (406 US 205, 218-219). Moreover, a State may constitutionally relieve a substantial governmental burden on a sect's exercise of its religion even when the burden falls short of an actual violation of the Free Exercise Clause *(see, Texas Monthly v Bullock,* 489 US 1, 18-19, n 8; *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Sts. v Amos,* 483 US 327, 334).

Here, the Monroe-Woodbury District had previously provided special educational services for Satmarer handicapped children at an annex to the sect's private parochial school for girls in the Village *(see, Board of Educ. v Weider,* 72 NY2d 174, 180, *supra).* In 1985, however, the Monroe-Woodbury District resolved that such services would only be offered in integrated classes at public schools outside the Village *(supra).* Thus, under the majority's assumption that segregated educa-

tion of their young is an integral part of Satmar religious precepts, the Satmarer Hasidim were placed in the dilemma of either having to forego the substantial benefits of publicly supported educational services for their handicapped children or availing themselves of those benefits at the price of foregoing their religious convictions regarding the manner of educating their children. Unquestionably, a governmental decision that forces a religious observer "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to [obtain the benefits] * * * puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her [religious practice]" *(Sherbert v Verner,* 374 US 398, 404; *see, Hobbie v Unemployment Appeals Commn. of Fla.,* 480 US 136, 140-141).

I am conscious of the danger that an unduly broad application of an accommodation to free exercise values rationale to uphold any governmental benefit to religion could ultimately result in the Free Exercise Clause swallowing up the Establishment Clause *(see, Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Sts. v Amos, supra,* at 347 [O'Connor, J., concurring]; Note, *The Free Exercise Boundaries of Permissible Accommodation Under the Establishment Clause,* 99 Yale L J 1127, 1138-1139). It cannot be said at this procedural stage in the action, however, that chapter 748 crosses the line from a valid alleviation of a burden on the Satmarer's religious precepts in separately educating their handicapped children to an invalid advancement of religion by promoting the Satmar sect's ability to inculcate its religious values in educating those children. First, undoubtedly, the loss of remedial and rehabilitative educational services for Satmarer handicapped children is a discernible, substantial burden *(see, Lee v Weisman,* 505 US —, — 112 S Ct 2649, 2677-2678 [Souter, J., concurring], *supra).* Second, the accommodation to Satmar religious educational practices is minimal, as compared to the practices in their parochial schools in the Village and to the accommodations described in *Parents' Assn. of P.S. 16 v Quinones* (803 F2d 1235, *supra).* The Court in *Parents' Assn. of P.S. 16* took pains to suggest that a constitutionally valid, minimal accommodation to Satmar religious beliefs could have been devised in providing remedial services to the sect's parochial school students by emphasizing that "in the circumstances of the present case, it is difficult to believe that the City cannot devise alternatives for making its reme-

dial services available to the Beth Rachel students in a way that neither requires them to disregard their religious beliefs nor appears to endorse those beliefs" (supra, at 1242). Third, the Satmarer Hasidim had attempted to obtain an acceptable accommodation to their religious beliefs in a less symbolically promotional manner by countersuing in *Board of Educ. v Weider (supra)* to compel the existing public school system to provide special educational services to their handicapped children at a neutral site in the Village. When that attempt was unsuccessful *(see, supra)* the statutory creation of the Village District became the only viable remaining means to accommodate Satmar practices regarding the separate education of the sect's children, a factor weighing in favor of the validity of the legislation *(see,* Tribe, American Constitutional Law § 14-15, at 1285-1286 [2d ed]). Fourth, the statute gives the Satmarer Hasidim no greater advantage in exercising their religious educational practices than they enjoyed prior to the Monroe-Woodbury District's decision to withdraw its special educational services from a site in the Village, an additional factor favoring validity *(see, Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Sts. v Amos, supra,* at 337).

Where, as here, the challenged statute promotes Free Exercise values by alleviating a substantial government-imposed burden on a religious observance, the symbolism of a governmental endorsement is entitled to relatively little weight in determining whether the statute's primary effect is to advance religion. As Justice O'Connor observed in *Wallace v Jaffree* (472 US 38, 83, *supra):* "It is disingenuous to look for a purely secular purpose when the manifest objective of a statute is to facilitate the free exercise of religion by lifting a government-imposed burden. Instead, the Court should simply acknowledge that the religious purpose of such a statute is legitimated by the Free Exercise Clause. I would also go further. In assessing the effect of such a statute—that is, in determining whether the statute conveys the message of endorsement of religion or a particular religious belief—courts should assume that the 'objective observer,' * * * is acquainted with the Free Exercise Clause and the values it promotes. Thus individual perceptions, or resentment that a religious observer is exempted from a particular government requirement, would be entitled to little weight if the Free Exercise Clause strongly supported the exemption." It follows from the foregoing that the statute facially passes the effects prong of the *Lemon* test,

whether or not one agrees with the majority view that the statute represents an accommodation to the Satmarer's religious beliefs and practices.

Turning then to the remaining prong of the *Lemon* Establishment Clause test, i.e., whether the creation of the Village District leads to an excessive government entanglement with religion, I find that for purposes of a facial challenge a violation of that standard has also not been demonstrated. In aid to education cases under the Establishment Clause, the risk of excessive entanglement has been found to arise in three forms of potential, mutual church-State intrusiveness: (1) the need for intense surveillance of a publicly supported secular educational program conducted under the auspices of religious authorities, to insure the absence of any religious indoctrination, (2) dual and overlapping administration of the religious and secular parts of the educational program, necessitating a close, continuing relationship between secular and religious educational and administrative staff, and (3) political divisiveness, for example, from budgetary competition between secular and religious programs *(see, Lemon v Kurtzman,* 403 US 602, 623, *supra; Aguilar v Felton,* 473 US 402, 413-414). As pointed out in *Bowen v Kendrick* (487 US 589, *supra),* however, typically a finding of excessive entanglement in educational aid cases has "rested * * * on the *undisputed fact* that the elementary and secondary schools receiving aid were 'pervasively sectarian' and had 'as a substantial purpose the inculcation of religious values' " *(supra,* at 616, quoting *Aguilar v Felton, supra,* at 411, quoting *Committee for Public Educ. v Nyquist,* 413 US 756, 768 [emphasis supplied]). The existence of a pervasively sectarian institutional setting for the Village District's programs, having a substantial purpose of religious indoctrination, certainly is not an "undisputed fact" here. Any monitoring of the program that occurs here would be exclusively of secular, not sectarian, professional staff. Furthermore, without the presence of religious educators or administrators participating in any of the programs conducted on premises by the Village District, the possibility of entanglements from necessary secular/sectarian working relationships is speculative and remote. Such factors have been held sufficient to sustain the validity of aid to education legislation under the excessive entanglement prong of the *Lemon* test *(see, Bowen v Kendrick, supra,* at 616-617; *Wolman v Walter,* 433 US 229, 248, *supra; Roemer v Maryland Pub. Works Bd.,* 426 US 736, 762). The potential for political divisiveness as a

result of the creation of the Village District also seems remote. The Satmarer handicapped children are entitled to publicly financed special educational services according to their needs irrespective of where they are provided or who provides them. The threat of political divisiveness is belied by the fact that the Monroe-Woodbury District, the political subdivision most directly affected financially by the carving out of the Village District, has consistently supported the position of the Village District in the instant action.

Based upon all the foregoing reasons, I have concluded that chapter 748 is not facially invalid under the Establishment Clause of the 1st Amendment. I would also hold it valid facially under article XI, § 3 of the NY Constitution, inasmuch as there is utterly nothing in the language of the statute or its legislative history establishing that the Village District is controlled by the Satmar sect. Accordingly, I would reverse Supreme Court's judgment, grant defendants partial summary judgment declaring chapter 748 facially valid, and remit to Supreme Court for trial on the outstanding issues of fact necessary to resolve the validity of the statute as applied.

MERCURE, MAHONEY and HARVEY, JJ., concur with CASEY, J.; LEVINE, J. P., dissents in a separate opinion.

Ordered that the judgment is affirmed, without costs.