Hancock, Jr., J.
(concurring). I join in Judge Smith’s opinion that chapter 748 of the Laws of 1989 has a primary effect of advancing religion and for that reason violates the Establishment Clause. I agree with the majority that it is, therefore, unnecessary to decide whether chapter 748 also violates the first or purpose test of Lemon v Kurtzman (403 US 602). However, if the Court were addressing that issue, I would hold —as Supreme Court and, in my view, the Appellate Division majority do — that the statute also violates the first Lemon test (see, Wallace v Jaffree, 472 US 38, 56, 64 [Powell, J., concurring], 75 [O’Connor, J., concurring]).[1] As the Appellate Division majority pointed out:
"The challenged statute, therefore, was designed * * * to provide * * * [special education] services within the Village so that the children would remain subject to the language, lifestyle and environment created by the community of Satmarer Hasidim and avoid mixing with children whose language, lifestyle and environment are not the product of that religion. The dissent finds a secular purpose for the statute in that it would provide the handicapped children of the Village with the *541 publicly supported, secular special educational services they need and to which they are entitled, but as previously noted those services were already available to all of the handicapped children of the Monroe-Woodbury District, including the handicapped children of the Village. Thus, the only secular need for the statute recognized by the dissent did not, in fact, exist” (Grumet v Board of Educ., 187 AD2d 16, 21 [emphasis added]).
Chapter 748 creates a special union free school district solely for the Village of Kiryas Joel so that its residents, almost all of whom are of the Satmarer Hasidic faith, may receive separate educational services for their handicapped children at public expense in place of the services which are already available to them as residents of the Monroe-Wood-bury School District. Obviously, the purpose of chapter 748 could not have been to meet the need of the residents of Kiryas Joel for special education services; such services were already available to them under State law as to all other residents of the Monroe-Woodbury School District. What is involved here is a special act of legislative and executive grace which makes available to the Kiryas Joel residents public education services to which they would not otherwise be entitled (contrast, Zobrest v Catalina Foothills School Dist., 509 US —, 61 USLW 4641 [where any child qualifying under a general government program for deaf children was entitled to benefits as a matter of right "without regard to the 'sectarian-nonsectarian, or public-nonpublic nature’ of the school the child attends” (id., 509 US, at —, 61 USLW, at 4644). In sum, chapter 748 was enacted solely as an accommodation, not as the fulfillment of an entitlement.
Was the purpose of this accommodation anything other than religious? Unquestionably, the accommodation was to meet a requirement peculiar to the residents of Kiryas Joel— that their children be permitted to associate only with children of the Satmar Hasidic sect. As I read the record, there is no dispute: (1) that the mandate of a separate and isolated existence is an important tenet in the Satmar Hasidic religious doctrine and inherent in the Satmar culture and way of life; or (2) that it is particularly important that this requirement of separation be strictly observed in the upbringing and education of Satmar children.
Creating the special school district which encompasses only *542 the Village of Kiryas Joel achieved this accommodation; special education could be furnished to the children of Kiryas Joel through their own exclusive program inside the Village limits where the children would mix only with the children of the Satmar faith. That a statute which is clearly intended to meet the special religious requirements of a particular sect is a statute having a religious purpose seems self-evident. If more is needed, it may be found in the record and the legislative history of chapter 748 (see, Bill Jacket, L 1989, ch 748; see also, Lentol Mem and Silver Mem, supra, n 1), and, indeed, in our prior decision concerning the special education for the children of this very Village (Board of Educ. v Wieder, 72 NY2d 174, 179-180, supra).
It is argued, however, that the legislative purpose of chapter 748 was to obviate the emotional and psychological trauma of the children upon being taken from the isolation of their unique community and placed with other children whose ways are different from theirs, and that, thus, the statute has a secular purpose. But, there is nothing in the statute or its legislative history suggesting that the enactment of chapter 748 was related to the psychological stress of the children or prompted by anything other than the well-meaning desire to comply with the religious requirement of keeping the Satmarer children separate from other children, concededly the cause of whatever emotional or psychological effect the children may have suffered. Indeed, the Appellate Division noted:
"The record, however, contains uncontradicted evidence of a direct link between the language, lifestyle and environment of the community’s children and the religious tenets, practices and beliefs of the community. Based upon similar evidence and in a similar procedural posture, the Court of Appeals had little difficulty finding such a connection. 'With an apparent over-all goal that children should continue to live by the religious standards of their parents, "Satmarer want their school to serve primarily as a bastion against undesirable acculturation, as a training ground for Torah knowledge in the case of boys, and, in the case of girls, as a place to gather knowledge they will need as adult women” ’ (Board of Educ. v Wieder, supra, at 180 [emphasis supplied])” (Grumet, supra, at 23 [emphasis added]).
*543 The question is not whether some legislative solution for prescribing psychological services for the Satmar children could be devised that would have a secular purpose and thus meet the first Lemon test. We are concerned only with the legal question of the purpose of the specific legislation before us. Chapter 748 establishes what amounts to a private school to furnish special education services at public expense to the residents of Kiryas Joel in order to accommodate their religiously mandated requirement of separation for their children. It does so through the extraordinary means of creating within an existing school district another coexisting district designed only to include a village whose residents are almost exclusively of a particular religious sect.
If a statute does not have a clearly secular purpose, it fails the first or "purpose” test of Lemon (see, Wallace v Jaffree, 472 US 38, 56). Justice Powell’s explanation of the first Lemon test in his Wallace concurrence is especially apt here:
"The first inquiry under Lemon is whether the challenged statute has a 'secular legislative purpose.’ Lemon v. Kurtzman, supra, at 612. As Justice O’Connor recognizes, this secular purpose must be 'sincere’; a law will not pass constitutional muster if the secular purpose articulated by the legislature is merely a 'sham.’ Post, at 75 (concurring in judgment). In Stone v. Graham, 449 U.S. 39 (1980) (per curiam), for example, we held that a statute requiring the posting of the Ten Commandments in public schools violated the Establishment Clause, even though the Kentucky Legislature asserted that its goal was educational” (Wallace, supra, at 64 [Powell J., concurring]).
But for the Satmarers’ religious mandate of separation, no statute and no governmental expenditures for special education services for the residents of Kiryas Joel would have been necessary. In short, the accommodation of the Satmarers’ religious requirements " 'was and is the law’s [only] reason for existence’ ” (Wallace, supra, at 75 [O’Connor J., concurring], quoting Epperson v Arkansas, 393 US 97, 108).
Realistically, can the legislative creation of the Kiryas Joel School District to make special additional educational services available in order to obviate the religious objections of its residents have a purpose other than religious? As a matter of common sense — given the wording of the statute, its apparent *544 intent and the absence of any reference to other than a religious purpose in the legislative history — the answer must be no.
Assuming, however, that chapter 748 can be construed as having a clearly secular purpose (see, Wallace, supra, at 56), I believe that, in its effect, it cannot be anything but a government action which unequivocally endorses religion in violation of the second Lemon test (see, Wallace, at 69 [O’Connor J., concurring]). Not only have the legislative and executive branches of government acted for the special benefit of a particular religious sect in creating the Kiryas Joel School District, but their action entails State aid which will relieve the private Talmudic academies and the residents of the Kiryas Joel Village of the financial burdens of providing required special education for the Satmarer children.[2] Thus, chapter 748 — like the money grants for maintenance and repair, the tuition reimbursement grants, and the income tax benefits struck down in Committee for Pub. Educ. v Nyquist (413 US 758) — constitutes the sort of State financial assistance for sectarian education which has the effect of furthering the religious mission in contravention of the second Lemon test (see, Grand Rapids School Dist. v Ball, 473 US 373, 393-395; Meek v Pittenger, 421 US 349, 364-366; Aguilar v Felton, 473 US 402, 422 [O’Connor J., dissenting]). As the Supreme Court recently stated in regard to its holdings in Meek and Ball:
"[T]he programs in Meek and Ball — through direct grants of government aid — relieved sectarian *545 schools of costs they otherwise would have borne in educating their students. See Witters [v Washington Dept. of Servs. for Blind, 474 US 481], at 487 C[T]he State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is "that of a direct subsidy to the religious school” from the State’) (quoting Ball, supra, at 394). For example, the religious schools in Meek received teaching material and equipment from the State, relieving them of an otherwise necessary cost of performing their educational function. 421 U.S., at 365-366. 'Substantial aid to the educational function of such schools,’ we explained, 'necessarily results in aid to the sectarian school enterprise as a whole,’ and therefore brings about 'the direct and substantial advancement of religious activity.’ Id., at 366. So, too, was the case in Ball: The programs challenged there, which provided teachers in addition to instructional equipment and material, 'in effect subsidize[d] the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects.’ 473 U.S., at 397. 'This kind of direct aid,’ we determined, 'is indistinguishable from the provision of a direct cash subsidy to the religious school.’ Id., at 395.” (Zobrest v Catalina Foothills School Dist., 509 US, at —, 61 USLW, at 4644, supra).

. That the purpose of chapter 748 was to obviate religious objections of the Satmarers seems plain from any reasonable analysis of the statute’s intent from its wording and the statutory scheme. This is borne out by the legislative history and the record. (See, for example, in Bill Jacket to L 1989, ch 748, Mem to Governor Cuomo from Assemblyman Silver urging approval, stating that the bill provides "a mechanism through which [Satmar] students will not have to sacrifice their religious traditions in order to receive the services which are available to handicapped students throughout the State” [emphasis added]; approval mem of Assembly sponsor Joseph Lentol stating that the "[H]asidic Jewish community holdfs] firmly to its religious tenets” [emphasis added]; affidavit of Professor Israel Rubin [the author of the book Satmar: An Island in The City quoted in Board of Educ. v Wieder (72 NY2d 174, 180)] to the effect that "[r]eligion and its preservation in the form interpreted and practiced in Satmar, occupies a central place in virtually all matters of importance”, that the Satmar schools "are meant to serve primarily as a bastion against undesirable acculturation”, that "basically, it is religion which underlies the practice of gender-segregation” and that the "private schools are, of course, among the places where gender segregation is strictly observed”; excerpts from book the Extraordinary Groups by Kephart and Zellner [St Martin’s Press 1991]: e.g., "The ethnocentric attitude that they alone are capable of upholding the Torah solidifies the Hasidic belief that all other groups are inferior” and "The goal of the [Satmar] community is social isolation” [id., at 165, 178].)

. The Budget Report on the Bill which was later enacted as chapter 748 contains the following: "Based on local wealth data provided by the Monroe-Woodbury school district, and assuming that the 100 special education pupils in the Kiryas Joel school district will be placed in programs qualifying for the high cost component of excess cost aid, we estimate a new Kiryas Joel school district budget of about $1.3 million and new State aid of about $400,000-$450,000. This would leave a local tax bill of about $900,000. Since Monroe-Woodbury attributes about $1.4 million of its tax base to the Village of Kiryas Joel, it appears that the Village’s tax payers will benefit from both new State aid and lower, local property taxes as a result of the creation of the new district. Also based on data supplied by Monroe-Woodbury (and current data available from the State Education Department), we estimate that the loss of property and income wealth attributed to the Village of Kiryas Joel will make Monroe-Woodbury poorer to the extent that it will receive operating aid on a formula basis rather than on save-harmless, as it now does. While the increases in State aid to Monroe-Woodbury, due to its then lower wealth, would not occur until the 1991-92 school year, we project such State aid increases would amount to 1.4 million” (Bill Jacket, L 1989, ch 748; emphasis added).