Bellacosa, J.
(dissenting). This case arises from a community’s search for special education services on behalf of approximately 200 handicapped children who, as Satmarer Hasidic Jews, reside with their families in the Village of Kiryas Joel in Orange County, New York. A decade of controversy of virtually epic proportions is reflected in litigation at various levels of State and Federal courts and in unsuccessful efforts by various protagonists to forge a local, secular, public education program for the pupils with special needs of the Village of Kiryas Joel. The State of New York in 1989 enacted a law which held the promise of a Solomon-like solution.
Although invested with a presumption of constitutionality, that statute is judicially nullified as a violation, on its face, of the Establishment Clause of the First Amendment of the United States Constitution. Because I believe that the Court *546 has erected a reverse presumption of unconstitutionality and because I agree with Justice Levine, dissenting at the Appellate Division, that the law is not facially defective, I respectfully dissent and vote to reverse.
L
Since 1977, the Village of Kiryas Joel has been an incorporated municipality in the Town of Monroe, Orange County, New York, populated by Satmarer Hasidic Jews. The lifestyle of the community — including distinctive dress, language, and customs — was described by this Court in Board of Educ. v Wieder (72 NY2d 174, 179-180). Before the legislation at issue, all school children of the Village, for public education purposes, were within the jurisdiction of the Monroe-W oodbury School District. Those pupils in the Village without special needs, however, receive their schooling in Satmarer Hasidim parochial schools. They are not involved in this litigation.
The challenged legislation evolved out of a series of court cases involving disputes between the residents of the Village and the Board of Education of the Monroe-W oodbury School District (which is now aligned as a party in this lawsuit with the Kiryas Joel Board of Education) concerning the provision only of special education services to the handicapped children of the Village. In 1988, when Board of Educ. v Wieder (id.) was decided by this Court, the Monroe-Woodbury School District had offered the Village’s handicapped students the special education services to which they were entitled under Federal and State law only at the district’s public schools. The Satmarer Hasidic residents of the Village demanded a neutral site within the Village. This Court held that the courts could not mandate that the location of the services be either the district’s public schools or a neutral site within the Village, though this Court also unanimously urged that efforts be undertaken by the protagonists to secure a neutral site and solution (Board of Educ. v Wieder, 72 NY2d, at 189, n 3, supra).
Both sides nevertheless persisted in their diametrically opposed positions, and the "true subjects of this controversy” (id., at 179), the handicapped Satmarer children, received no special education. The Satmarer Hasidim removed their special-needs children from the Monroe-Woodbury School District’s public schools, after an experimental effort and period, because they felt that the district’s failure to accommodate *547 their distinct language and cultural needs had a "major adverse effect on [their special-needs children’s] educational progress” and on the children’s psychological and emotional well-being. Ultimately, the New York State Legislature acted to end the long standoff.
Chapter 748 of the Laws of 1989 established "a separate school district in and for the village of Kiryas Joel, Orange county”. The statute granted the new school district the powers of a union free school district under the State Education Law, and provided that the district shall be controlled by a board of education, elected by the qualified voters of the Village. The Monroe-Woodbury Board of Education unanimously supported the legislation, urging the Governor to sign the bill "because it will allow for the proper education of the Kiryas Joel handicapped children. * * * The creation of a separate school district will serve to reduce community tension and lead to productive relationships.” (Bill Jacket, L 1989, ch 748.) Governor Cuomo approved the legislation, effective July 1, 1990, commenting in the official Approval Message that "[m]y Counsel * * * advises that the bill is, on its face, constitutional. I am persuaded by my Counsel’s view. * * * [T]his bill is a good faith effort to solve this unique problem” (Approval Message of Governor, 1989 NY Legis Ann, at 324-325).
The new school district operates a public school which provides education only to the district’s children with special needs. Under the statute, the district must operate in a secular manner. The superintendent of the school, who is not Hasidic, served for 20 years in the New York City public school system, where he acquired expertise in the area of bilingual, bicultural, special education for handicapped children. The teachers and therapists, all of whom live outside the Village, teach mixed classes of boys and girls a wholly secular curriculum of subjects, such as reading, writing, arithmetic, music and physical education. The statute requires the school to comply with all State laws, rules and regulations affecting public education, including a prohibition against any form of discrimination.
IL
The New York State School Boards Association (NYSSBA) and two of its officers instituted this action in January 1990 against the New York State Education Department and vari *548 ous State officials, seeking a declaration of unconstitutionality of the statute. The Kiryas Joel and Monroe-Woodbury Boards of Education intervened as defendants. Although the parties stipulated to a discontinuance of the action as to the defendant State officials, the Attorney-General has continued to defend the constitutionality of chapter 748 (see, Executive Law § 71). The organizational plaintiffs (NYSSBA and Messrs. Grumet and Hawk, in their capacities as NYSSBA officers) were ultimately found to lack standing to challenge the statute, an aspect of the case not before us. However, the two named individuals remain as taxpayers plaintiffs-respondents.
Plaintiffs moved and defendants cross-moved for summary judgment on facial grounds only, inasmuch as no discovery or any other factual inquiry in this case has been undertaken. Supreme Court, Albany County, held that chapter 748, on its face, violated all three prongs of Lemon v Kurtzman (403 US 602) and therefore violated the principle of separation of church and State. The Appellate Division affirmed, holding that chapter 748, on its face, violates at least the second prong of the Lemon test because its primary effect is the advancement of religion. This Court also strikes the law down on only prong two, the primary effect aspect of Lemon, although the concurrences advance newly refined additional bases for invalidation.
Plaintiffs press their argument before this Court that chapter 748 violates all three prongs of the Lemon test. Although defendants-appellants proffered a secular purpose for the legislation, plaintiffs characterize it as a "sham” (Supreme Court referred to it as a "camouflage [of] secular garments” [151 Misc 2d 60, 64]). Plaintiffs allege that the purpose of the statute is to cater to the "religious separatist tenets” of the Satmar Hasidim. They also argue that chapter 748 has the primary effect of advancing the religious tenets of the Satmar Hasidim, because the statute allows them to maintain their separatism. Finally, they urge that it constitutes a State endorsement of religion.
Defendants-appellants reject plaintiffs’ claims on the ground that plaintiffs have not met their heavy burden of rebutting the presumptive facial constitutionality of chapter 748 of the Laws of 1989 beyond a reasonable doubt. Defendants also demonstrate, to the contrary, that the statute should survive facial scrutiny on all three branches of the Lemon test and urge that it should not be struck down without evidentiary development and as-applied analysis.
*549 IIL
No one disputes that the Legislature has the fundamental power to create a union free school district within the boundaries of a previously existing school district to facilitate the provision of public education to a particular group of students (see, e.g., Town of Greenburgh, UFSD No. 13, chapter 559 of the Laws of 1972; Town of Mt. Pleasant UFSD, chapter 843 of the Laws of 1970; Gananda School District Act, chapter 928 of the Laws of 1972). Plaintiffs concede that approximately 20 such school districts have been created by acts of the Legislature.
Nevertheless, plaintiffs predicate their challenge, to what is otherwise an entirely secular act of public education administration effected by the other two branches of State government, on their sectarian interpretation of the unique, overlapping cultural and religious characteristics of the population of the Village of Kiryas Joel and its identical geographical boundaries with the new school district. They assert that the citizens of Kiryas Joel are exclusively Satmarer Hasidim and will remain as such. However, no claim is made of any alleged restrictive covenants among the Village’s property owners, or of any alleged irregularity in the conduct of municipal or school district elections, or of any exclusion of non-Hasidim in any respects of governance, employment or availment of educational services. Indeed, there is no showing that nonSatmarer Hasidim students are precluded from attending and taking advantage of this special education program. What plaintiffs assert, in sum, substance and effect, is that because the municipality and school district share identical borders and frame an enclave currently populated only by Satmarer Hasidim, the very existence of the public school district by authorization of the Legislature and executive constitutes, on its face, an establishment of religion prohibited by the United States Constitution. The logical and inexorable extension of this canon would dictate the extinguishment of the Village itself for the identical infirmity.
IV.
To evaluate plaintiffs’ claims under the currently prevailing Lemon test, the Court must examine the purpose and effects of the legislation, as well as the possibility of government entanglement resulting from the legislation (see, New York *550 State School Bds. Assn. v Sobol, 79 NY2d 333, 338-339). While many personal expressions of the Justices of the United States Supreme Court question the vitality of Lemon (see, Lamb’s Chapel v Center Moriches Union Free School Dist., 508 US —, —, 113 S Ct 2141, 2149-2151 [June 7, 1993] [Scalia, J., concurring]), the institutional postulate of that Court remains unchanged — Lemon controls (id., 508 US, at —, 113 S Ct, at 2148, and n 7 [White, J., opn of Court]). However, the analysis in an Establishment Clause case, decided. 11 days later, abstains from discussion of the Lemon test (see, Zobrest v Catalina Foothills School Dist, 509 US —, 61 USLW 4641 [June 18, 1993]).
The first Lemon prong — that "the statute must have a secular legislative purpose” (Lemon v Kurtzman, supra, at 612) — is breached only if the enactment was "motivated wholly by [a religious] purpose” (Bowen v Kendrick, 487 US 589, 602 [emphasis added]; see, Wallace v Jaffree, 472 US 38, 56). Chapter 748 was enacted for the stated purpose of allowing only handicapped pupils of the Village of Kiryas Joel to receive a publicly supported, secular special education to which they are entitled (see, Governor’s Mem, 1989 NY Legis Ann, at 324-325). This objective satisfies the secular purpose prong of the Lemon test.
Next, in considering the facial attack, the Court seems satisfied that a third-prong violation, excessive entanglement, has not been demonstrated. The Kiryas Joel public school established for this Village is not a "pervasively sectarian environment” of the type which generally raises the entanglement problem (see, e.g., Aguilar v Felton, 473 US 402, 412; Meek v Pittenger, 421 US 349). The education program is exclusively and thoroughly nonsectarian; the staff is secular; all regulatory monitoring is of the traditionally accepted educational variety and is designed to assure that the secular staff adheres to the State-approved secular curriculum (see generally, Grumet v Board of Educ., 187 AD2d 16, 36-37 [Levine, J., dissenting]).
The Court’s dispositive analysis turns ultimately on only the second Lemon prong, the "effects” test. Defendants contend that the educational services offered by Monroe-Woodbury School District prior to the enactment of chapter 748 were inadequate, because the services did not accommodate "the distinct language and cultural needs of the handicapped children” in the Village, and the primary effect of the legislation *551 is to remedy that problem. In bold dichotomy, plaintiffs’ central argument that the primary effect of the statute involves "the State in sponsorship of Satmar separatist precepts” is adopted by the Court, contrary, in my view, to the spirit of the holding and analysis of Zobrest. The primary effect benefits the handicapped students in a secular manner; only an "attenuated” effect reaches the religion of their community.
As initially articulated, the effects prong demands of legislation that "its principal or primary effect must be one that neither advances nor inhibits religion” (Lemon v Kurtzman, supra, at 612). In subsequent application, the Supreme Court has augmented this restriction to require that any nonsecular effect be remote, indirect and incidental. Courts attempting to apply the "effects” test must also grapple with the related subsidiary concern of whether the governmental action constitutes an "endorsement” of religion. As Justice Kennedy recently observed, however, the Supreme Court’s unsettled jurisprudence in the area of possible government "endorsement” of religion leaves this subbranch of the Lemon test somewhat suspect (see, Lamb’s Chapel v Center Moriches Union Free School Dist, 508 US —, —, 113 S Ct 2141, 2149, supra [June 7, 1993] [Kennedy, J., concurring]).
The Supreme Court has used "endorsement” as a factor for assessing whether an impermissible purpose or effect infects a challenged law (see, e.g., Grand Rapids School Dist. v Ball, 473 US 373, 389); however, the meaning of "endorsement” is not "self-revealing” (compare, Church ofLukumi Babalu Aye v Hialeah, 508 US —, —, 113 S Ct 2217, 2241 [Souter, J., concurring]).
Unraveling whether a particular governmental action runs afoul of this test is a tricky and complicated process. Justice O’Connor initially proposed the "no endorsement” test in Lynch v Donnelly (465 US 668, 691-693 [O’Connor, J., concurring]). Its protean — and controversial — nature is evidenced by the fact that in that case she found that a municipality’s display of a Christmas creche was not an endorsement of religion. In her view, the printing of "In God We Trust” on coins and the opening of court sessions with "God save the United States and this honorable court” were also not constitutionally offending endorsements (id., at 693).
Justice O’Connor in Wallace v Jaffree (472 US 38, supra) offered an "objective observer” refinement to the endorsement *552 factor. Much like the reasonable person embodied in the negligence standard, the so-called objective observer is expected to form a perception on the basis of familiarity with "the text, legislative history, and implementation of the statute” as to whether a particular State action constitutes an endorsement of religion or of a particular religious belief (id., at 76). Moreover, any objective observer would presumably also be "acquainted with the Free Exercise Clause and the values it promotes” (id., at 83). Thus, the objective observer should be aware of the overlap and tension between the Establishment and Free Exercise Clauses, and the permissibility of accommodation to Free Exercise concerns (id.). To be sure, the Supreme Court has not yet adopted Justice O’Con-nor’s nuance for detecting an alleged endorsement, but neither has it otherwise clarified the method and criteria for unveiling an impermissible endorsement (see, e.g., Smith, Symbols, Perceptions, and Doctrinal Illusions: Establishment Neutrality and the "No Enforcement” Test, 86 Mich L Rev 266).
Reasonable minds may differ as to whether the actuality or the symbolism of the State’s facilitation of publicly administered special education to handicapped pupils of an incorporated municipality is an endorsement of the children’s or their parents’ religion. To allow for no reasonable doubt on a facial review and to decide this case as a forbidden establishment of a religion is at least arguable. "Objective observers” could not, in my view, so definitively conclude or perceive this situation as an establishment of a religion, without inspiring some inquiry as to whether their views perhaps suffered from a predisposed hostility to religion in the constitutional debate sense. Truly objective observers should be able to conscientiously accept this legislation as secular, neutral and benign within the reasonable doubt spectrum (see, Tribe, American Constitutional Law, at 1176, 1187-1190, 1221 [2d ed]). For comparative analysis, as an example, one might view the direct aid to the handicapped pupil in a parochial school in Zobrest as the scaling of the wall of separation; yet, it was held constitutional under a broadly applicable analysis. In contrast, in this case the State stayed safely off and away from the forbidden wall by aiding a group of handicapped pupils in a specially created public school; yet, the Court here declares the legislative act unconstitutional. I find this perplexing, to say the least.
This Court has said that "[governmental action 'endorses’ religion if it favors, prefers, or promotes it” (majority opn, at *553 528; see also, New York State School Bds. Assn. v Sobol, 79 NY2d, at 339, supra). In applying that proposition at face value, the Court concludes that Satmarer Hasidism is impermissibly favored, preferred or promoted by chapter 748. I disagree because context is key (see, New York State School Bds. Assn. v Sobol, supra). Here, no message of endorsement for Satmar theology or its particular separatist tenets need necessarily or can fairly be inferred, either by objective third parties or by the protagonists themselves. On the other hand, it can fairly be said that the people of the State of New York, as a whole, gain a compelling benefit in the compromise solution achieved here. The New York commonweal is primarily advanced. It should not be forgotten or overlooked that the long-simmering, underlying dispute spilled over the borders of the Village into the broader surrounding community, and resulted in a complete impasse. The legislation, judicially dissolved in this case, was the negotiated denouement at the highest policy level available in a democracy, the State Legislature. As Professor Tribe has noted, "[l]eaving room for legislatures to craft religious accommodations recognizes that they may be in a better position than courts to decide when the advantages of strict neutrality are overstated” (Tribe, American Constitutional Law § 14-7, at 1195 [2d ed] [emphasis added]). Former Justice Brennan emphasized this important nuance by observing that "even when the government is not compelled to do so by the Free Exercise Clause, it may to some extent act to facilitate the opportunities of individuals to practice their religion” (Marsh v Chambers, 463 US 783, 812 [Brennan, J., dissenting]).
The incidental, "attenuated” benefit to the minority Satmar viewpoint supports this State’s rich pluralistic tradition and does not diminish, but rather enhances, the common good. I conclude that the incidental benefit to the Satmar Hasidim citizens does not render the State’s legislative solution facially impermissible because:
"[i]t does not follow, of course, that government policies with secular objectives may not incidentally benefit religion. The nonsectarian aims of government and the interests of religious groups often overlap, and this Court has never required that public authorities refrain from implementing reasonable measures to advance legitimate secular goals merely because they would thereby relieve religious groups of costs they would otherwise *554 incur. See Mueller v. Allen, 436 U.S. 388, 393 (1983).” (Texas Monthly v Bullock, 489 US 1, 10.)
The unmistakable reality of this case is that the stricken legislation tried to create a secular public school for pupils with special education needs. The majority concludes that the effort fails. Yet, the new public school district offers programs and services at odds with many basic precepts of Satmarer Hasidism. Secularism itself is antithetical to Hasidism, yet secularism is the quid pro quo imposed by the State for these Village residents to avail themselves in this way of State-regulated special educational services for their handicapped youngsters. Though the Legislature bent over backwards, as a last resort, to address the legitimate special education needs of the Satmarer students, it did not bend to the theology of their families or community (see generally, Tribe, American Constitutional Law § 14-7, at 1195 [2d ed]). For its effort, the Legislature and executive and the citizens who sought recourse through the democratic process are deemed religious gerrymanderers and educational segregationists (see, concurring opn, Kaye, Ch. J., at 534, 538; contrast, Matter of Wolpoff v Cuomo, 80 NY2d 70, 78-80).
On the other hand, there has been substantial approbation from the surrounding and affected non-Satmarer community for the fairness and equity of the State providing a secular solution for what had previously proved to be an intractable local dispute. Indeed, defendant-intervenor-appellant Board of Education of the Monroe-Woodbury Central School District has not regarded the legislation as a repudiation of the secular educational principles for which it previously and steadfastly fought as litigant against the Satmarer Hasidim, or as an approval of the separatist tenets of the Satmar. Although it was unable to achieve a solution on its own, its present amity is noteworthy (Board of Educ. v Wieder, 72 NY2d 174, supra).
As the Supreme Court noted in Wolman, "[t]he fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke the same concerns that troubled the Court in Meek [v Pittenger]” (Wolman v Walter, 433 US 229, 247). "The purpose of the program is to aid school children * * * Certainly the Establishment Clause should not be seen as foreclosing a practical response to the logistical difficulties of extending needed and desired aid to all the children of the community” (id., at n 14). The United States Supreme Court *555 built on those comments in Zobrest v Catalina Foothills School Dist. (509 US —, 61 USLW 4641 [June 18, 1993], supra) by observing that "we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit” (id., 509 US, at —, 61 USLW, at 4643 [Rehnquist, Ch. J., opn of Court]). That is the substantive effect of this legislation. This Court, nevertheless, objects as to the form selected and prescribed by this State’s Legislature and Executive.
In fact, Board of Educ. v Wieder (72 NY2d 174, supra) aspirationally urged the provision of services separately to the handicapped students of Kiryas Joel, if Monroe-Woodbury School District could find a way to do so (id., at 189, n 3). Wolman was offered as authority and a guidepost of significant promise for the Legislature in promulgating its ultimate substantive result (id.). Ironically, the Legislature’s action is criticized as radical and not sufficiently tailored (concurring opn, Kaye, Ch. J., at 532, 538).
I conclude that strong and sufficient authority and analysis, past and immediate, support the view that the principal or primary effect of the challenged legislation does not advance religion in this unique context, and that no endorsement of religion may be fairly inferred.
V.
This latest litigation reaches this Court by appeal as of right on constitutional grounds from the affirmance of summary judgment granted to plaintiffs in the Supreme Court declaring chapter 748 facially unconstitutional. In that procedural framework, of course, disputed inferences or factual issues must be viewed in the light most favorable to defendants and challenges on an as-applied basis should await a future day of reckoning. Undeniably, a sharp Sword of Damocles hangs over the officials charged with implementation of this statute. As Governor Cuomo observed, "[o]f course this new school district must take pains to avoid conduct that violates the separation of church and state * * * I believe they will be true to their commitment” (Approval Message of Governor, 1989 NY Legis Ann, at 325).
The concerns about the degree under which this new school district actually operates within the direction and control of *556 elected community leaders who share a particular religious persuasion are issues of applied fact, not law. A similar fact mix is presented as to whether the creation of such a school is footed solely in the religious preferences of the Satmar or in their cultural, essentially secular, needs and rights, which are entitled to an enlightened and permissible societal accommodation. The needs, at least as emphasized by defendants, stem from the additional emotional impacts on Satmarer handicapped students. Defendants note that if these students — already special — are compelled to leave the Village and attend special education instruction in the Monroe-Woodbury public schools, they are met with a negative and hostile environment in which their language, customs and appearances are regarded as oddities, at best. Justice Levine sagely observed in dissent at the Appellate Division that deeply troubling concerns persist as to whether the courts are able, even in trial, to delve into, trace and ascertain the "true” Satmar theology and precepts (Grumet v Board of Educ., 187 AD2d, at 29, supra [Levine, J., dissenting]; see also, Tribe, American Constitutional Law § 14-11, at 1231 [2d ed]). The bottom procedural line is that this Court has plainly disfavored summary disposition when faced with similarly sensitive and complicated questions of fact (see, Ware v Valley Stream High School Dist., 75 NY2d 114,131).
VL
Notably, the record in this case documents sharp contrasts between the manner in which the secular special educational services are provided in the Kiryas Joel public school and the distinctive religious lifestyle of the Village. English is the language of instruction within the school; Yiddish is the medium of communication within the Village. In contrast to the method of instruction at the sectarian schools in the Village, male and female students at the public special education school are grouped together for teaching purposes at the special school; instructional materials are not based upon the sex of the student being taught; female employees are not prohibited from exercising authority over male employees; the physical appearance of the building is secular, including the significant absence of mezuzahs on the doorposts; and the dress of the employees is secular in appearance. The democratically elected Board of Trustees of the Kiryas Joel Village School District has strained to create a nonsectarian educa *557 tional environment which is faithful to the secular command of the statute. Plainly, this effort is indicative of the secular compromise the Hasidim community was willing to absorb to allow the special education needs of their children to be met within a public, neutral, nondenominational setting.
The judicial nullification of this latest phase of the longstanding tug-of-war prompts the larger question whether control over a public school may ever be placed in the hands of secularly elected individuals who have a common set of religious beliefs. Does a forbidden "symbolic union” always and automatically emerge? The three opinions of the majority suggest so, but I emphatically think not. It is important and fundamental to understand that the establishment of a union free school district geographically identical to an incorporated municipality, in the context of the constitutional and statutory guarantees of public education, neutral religious rights and nondiscrimination provided by both Federal and State law, should not be stigmatized as aid to a particular denomination, simply because the inhabitants of that municipality are predominantly or even exclusively members of that denomination.
For the Court to reject the Legislature’s answer with a blunt "No” deprives the citizens of Kiryas Joel of certain educational prerogatives in contravention of their fundamental right to self-governance. Their free exercise of religion is also inextricably implicated and compromised, simply because they have chosen to live and believe in a particular way together in an incorporated village. This dogmatic "No” at the end of a long, difficult odyssey once again strips the special-needs children of their protected public education rights. In effect, their Free Exercise rights are burdened by draping a drastic, new disability over the shoulders of young pupils solely on account of the religious beliefs of their community (see, Church of Lukumi Babalu Aye v Hialeah, 508 US —, —, 113 S Ct 2217, 2239-2240, supra [Scalia, J., concurring]; see also, McDaniel v Paty, 435 US 618).
The facile notion that the cultural, psychological and secular differences of the special-needs children of Kiryas Joel cannot be classified as anything but religious in nature should be rejected as alien to our most cherished traditions and values. The cultural disposition and circumstances of handicapped Satmarer children should not disqualify them from government attention on the bare conclusion that their differ *558 entness is derived solely from their religious beliefs and, therefore, is constitutionally inseparable from their religiosity. A culturally diverse Nation, which proclaims itself under a banner, E Pluribus Unum, should not tolerate such a self-contradiction, for to penalize and encumber religious uniqueness in this way, in effect, strikes the "E Pluribus” and leaves only the "Unum. ”
As Justice Levine cogently cautioned in his dissent at the Appellate Division:
"In effect, the majority is saying that the State may not respond to a bona fide secular interest of the Satmarer Hasidim, i.e., the psychological and emotional vulnerabilities of their handicapped children, because the culture bringing about the insecurities of these youngsters was 'molded’ by Satmar religious precepts. In a real sense, then, the majority is thus holding that merely because of some link between their religion and a legitimate secular need, the Satmarer are disqualified from receiving from the State the purely secular services to meet that secular need” (Grumet v Board of Educ., 187 AD2d, at 29, supra [Levine, J., dissenting]).
Courts have no choice but to enter the struggle to examine the evidence and demarcate between a religious practice and the secular cultural consequences of that practice in a pluralistic society after the Legislature has persevered in doing so. If the courts refuse to do so and insist instead on overturning legislation, such as that at issue here, because it is asserted to be nothing more, on its face, than a forbidden accommodation to the exercise of religious "separatism,” then frank confrontation with the values and rights under the Free Exercise Clause becomes unavoidable. Without a doubt, the two clauses —Establishment and Free Exercise — are in some historical and modern natural tension, and the overlap of the clauses may be said to create a "zone of permissible accommodation” (Tribe, American Constitutional Law § 14-7, at 1194 [2d ed]; see also, Ware v Valley Stream High School Dist., 75 NY2d 114, supra). Justice Souter (with Justices Stevens and O’Con-nor joining) recently reiterated this principle in the concurring opinion in Lee v Weisman (505 US —, 112 S Ct 2649):
"That government must remain neutral in matters of religion does not foreclose it from ever taking *559 religion into account. The State may 'accommodate’ the free exercise of religion by relieving people from generally applicable rules that interfere with their religious callings. See, e.g., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 [1987]; see also, Sherbert v. Verner, 374 U.S. 398 [1963]. Contrary to the views of some, such accommodation does not necessarily signify an official endorsement of religious observance over disbelief’ (Lee v Weisman, 505 US, at —, 112 S Ct, at 2676-2677, supra).
Chapter 748 of the Laws of 1989 could be viewed as a reasonable accommodation of the Satmarer’s free exercise of religion because it alleviates, as a last resort, their lack of choice in either having to forego the substantial benefits of publicly supported special educational services for their handicapped children or having to abandon their religious principles. That accommodation in these circumstances, on a facial attack and analysis, is supportable as a permissible deference to the historical and evolved predominance of Free Exercise protection in First Amendment constitutional adjudication.
I would therefore reverse and not declare chapter 748 unconstitutional on its face. The judicial nullification of the democratic prerogatives and solution for this intractable town-wide controversy is not justified. Instead, it seems to spring from a reflexive veneration of a symbolic metaphor that sacrifices concededly necessary special education services of a small group of handicapped pupils. A real wall of separation thus arises and solidifies to a mythic height and density.
Chief Judge Kaye and Judges Simons and Hancock, Jr., concur with Judge Smith; Chief Judge Kaye and Judge Hancock, Jr., concur in separate concurring opinions; Judge Bellacosa dissents and votes to reverse in another opinion in which Judge Titone concurs.
Order modified, etc.